**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**


**ANGELA MAYNE-HARRISON,**

      **Plaintiff**,

**v.**                             **Civil Action No. 1:09-CV-42
(BAILEY)**

**DOLGENCORP, INC., et al.,**

      **Defendants**.


<u>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**</u>

The above-styled matter is currently before the Court on defendant Dolgencorp's Motion for Summary Judgment [Doc 57], plaintiff's Response in Opposition [Dos. 73, 75], and defendant's Reply in Support of its Motion [Doc. 79]. Also pending before the Court is defendant's Motion to Strike [Doc. 74], Plaintiff's Response in Opposition to defendant's Common Motion for Summary Judgment [Doc. 78]. The Court has reviewed the record and the arguments of the parties and finds, for the reasons stated below, that defendant's Motion for Summary Judgment as to plaintiff Mayne-Harrison [Doc. 57] should be **GRANTED**, and that defendant's Motion to Strike [Doc. 74] should be **GRANTED in part** and **DENIED in part**.

**I.**      **BACKGROUND**

On May 21, 2010, defendant filed a Motion for Summary Judgment [Doc. 57]. Defendant argues that as a matter of law plaintiff Mayne-Harrison was an exempt employee under the Fair Labor Standards Act ("FLSA") Chapter 29, United States Code Section 207

1

because as a store manager she was employed in a bona fide administrative capacity. (Id.)  On June 14, 2010, plaintiff filed her Response [Docs. 73, 75].  In her Response, Mayne-Harrison argued that the store she managed was understaffed and that the majority of the work she performed was non-managerial manual labor, such as stocking the shelves and running the cash register.  Additionally, plaintiff argues that she had little discretion in running the store she managed due to corporate policies and supervision from district managers ("DM").  (Id.)  On June 25, 2010, defendant filed its Reply [Doc. 79].  In its Reply, defendant argues that plaintiff's own testimony establishes that she was an exempt employee because management was Mayne-Harrison's primary duty.  (Id.)

In addition to the individual motion for summary judgment, on May 21, 2010, defendant also filed a Common Brief in Support of Its' Individual Motion(s) for Summary Judgment [Doc. 59].   On June 14, 2010 Plaintiff likewise filed a Common Response in Opposition to defendant's Common Brief [Doc. 73].  On June 25, 2010, defendant filed a Common Reply in support of its' Individual Motion(s) for Summary Judgment [Doc. 77].

Additionally, on June 25, 2010, defendant filed a Motion to Strike plaintiff's Response in Opposition to the Individual Motion(s) for Summary Judgment [Doc. 78], arguing that some of the evidence submitted with plaintiff's Response should not be considered as they fail to meet the requirements of the Federal Rules of Evidence, and should, therefore, not be considered by this Court. (Id.)  On July 7, 2010, plaintiff filed a Response to the Motion to Strike [Doc. 80], arguing that the evidence is admissible.

## II.    UNDISPUTED MATERIAL FACTS

1.    Dollar General initially hired Mayne-Harrison in June of 1996 as a temporary clerk to assist with the opening of Store No. 3539 in Kingwood, West Virginia, which opened on

September 26, 1996. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 16-17, Mayne-Harrison 2010 Depo [Doc. 57-2] at 34, 36; Pl.'s Resp. [Doc. 75] at 4).

2.     Once the Kingwood store opened, Mayne-Harrison was promoted to a regular full-time position as a clerk. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 35, 37; Pl.'s Resp. [Doc. 75] at 4).

3.     Shortly after the Kingwood store opened in September of 1996, Mayne-Harrison was promoted to Assistant Store Manager ("ASM"). (Mayne-Harrison 2010 Depo [Doc. 57-2] at 41, 45; Pl.'s Resp. [Doc. 75] at 4).

4.     On June 19, 1999, Mayne-Harrison was promoted to Store Manager. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 42, 45; Pl.'s Resp. [Doc. 75] at 4).

5.     Mayne-Harrison remained the Store Manager at Store No. 3539 in Kingwood until she resigned in September 2004. (Mayne-Harrison 2010 Depo Ex. 65: Mayne-Harrison's application for subsequent emplyment with West Virginia University [Doc. 57-4]; Pl.'s Resp. [Doc. 75] at 4).

6.     As a Store Manager, Mayne-Harrison was responsible for supervising between 8 and 12 employees, including an ASM, a Third-Key Clerk (a clerk who holds a third key to the front door, along with the Store Manager and ASM), and other clerks[1]. (Mayne-

---

[1]     Plaintiff objects to the statement that Mayne-Harrison was responsible for supervising these employees because the labor budget restricted her ability to supervise and "there were times when Harrison had to be in the store by herself. During this time, Harrison was obviously not supervising any employees" ([Doc. 75] at 4). Viewing the facts in the light most favorable to plaintiff, however, the Court finds that the fact that plaintiff was occasionally alone in the store, does not discount the fact that Mayne-Harrison was responsible for supervising between 8 and 12 employees.

Harrison 2010 Depo [Doc. 57-2] at 68-69, Mayne-Harrison 2010 Depo Ex. 55: store reports for Mayne-Harrison's store [Doc. 57-5]; Pl.'s Resp. [Doc. 75] at 4).

7.      Mayne-Harrison was responsible for managing an average of approximately 237 labor hours per week[2].  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 69; Pl.'s Resp. [Doc. 75] at 4).

8.      In 2001, Mayne-Harrison was initially paid a salary of $370 per week.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 69; Pl.'s Resp. [Doc. 75] at 4).

9.      Mayne-Harrison received raises from her starting salary, and in 2002, was paid a salary of $423 per week.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 78; Pl.'s Resp. [Doc. 75] at 4).

10.     At the time of her resignation in 2004, Mayne-Harrison was paid $598 per week, or an annual salary of $31,096.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 83; Pl.'s Resp. [Doc. 75] at 4).

11.     As Store Manager, Mayne-Harrison was the only employee designated by Dollar General to be an exempt, salaried employee in her store.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 51; Pl.'s Resp. [Doc. 75] at 4[3]).

---

[2] Plaintiff's objection to the number 237 is based on the fact that the district manager provided Mayne-Harrison with a dollar figure, not a number of hours. ([Doc. 75] at 4) (citing Mayne-Harrison 2005 Depo. [Doc. 75-56] at 38).  Viewing the testimony in the light most favorable to plaintiff, however, the Court finds that the number 237 is accurately drawn from plaintiff's deposition testimony.

[3] The Court notes that plaintiff objected to the defendants' assertion that Mayne-Harrison was the "only exempt salaried employee in her store."  Plaintiff argues that the District Manager was a part of the Kingwood store team.  The Court finds, construing the

12.     Mayne-Harrison also was eligible for, and received, a bonus based on the performance of her store.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 98-100; Pl.'s Resp. [Doc. 75] at 4).

13.     In 2001, Mayne-Harrison received a $13,000 bonus.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 69, 71; Pl.'s Resp. [Doc. 75] at 4).

14.     Her bonus was a substantial component of her total compensation in 2001 (40%).  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 69, 71, 83 (13,000/ 32,000 = 40.625%); Pl.'s Resp. [Doc. 75] at 4).

15.     In 2002 and in 2003, Mayne-Harrison received a $10,000 bonus.  (Mayne-Harrison 2005 Depo [Doc. 57-1] at 43, Mayne-Harrison 2010 Depo [Doc. 57-2] at 78; Pl.'s Resp. [Doc. 75] at 4).

16.     In 2004, Mayne-Harrison received a $5,681 bonus.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 84; Pl.'s Resp. [Doc. 75] at 4).

17.     During Mayne-Harrison's employment as Store Manager, the ASM in her store, who was an hourly employee, earned approximately $7.00 per hour, which was approximately $280 per 40-hour workweek[4].  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 69, 78, [Doc. 57-

_____

facts in the light most favorable to plaintiff, that the District Manager while occasionally working in Mayne-Harrison's store was not solely responsible for _one_ store and of necessity must visit the other stores in the district.  Thus, the District Manager cannot be considered a constant part of the Kingwood store team.

    [4] Plaintiff objects on the grounds that defendant "attempts to create the appearance that Harrison earned significantly more per week than the assistant store manager." ([Doc. 75] at 4-5).  In plaintiff's deposition, however, she states the amount that the assistant store manager made.  Plaintiff's objection that she worked more hours per week than the

5]; Pl.'s Resp. [Doc. 75] at 4).

18.     The ASM was not eligible for the same type or amount of bonuses as the Store Manager, and, during Mayne-Harrison's employment as Store Manager, the ASM in her store never received a bonus of more than $500.20. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 71, Mayne-Harrison 2005 Depo. [Doc. 57-1] 48 (noting that during the time when both she and the ASM were eligible for a bonus, the ASM always received significantly less); Pl.'s Resp. [Doc. 75] at 4-5).

19.     During Mayne-Harrison's entire tenure as Store Manager she reported to a District Manager ("DM"). (Mayne-Harrison 2010 Depo [Doc. 57-2] at 56, [Doc. 57-5]; Pl.'s Resp. [Doc. 75] at 5).

20.     Mayne-Harrison had five or six different DMs, but each visited her store only once every three months. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 47, Mayne-Harrison 2005 Depo [Doc. 57-1] at 84-85 (noting that plaintiff saw the DM "very seldom" maybe once every three months); Pl.'s Resp. [Doc. 75] at 5).

21.     During the DM visits, the DM stayed approximately two hours, but spent "ninety percent of the time" during a visit, in the store office on the phone and not communicating with Mayne-Harrison. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 48-49, Mayne-Harrison 2005 Depo [Doc. 57-1] at 86; Pl.'s Resp. [Doc. 75] at 5).

22.     Other than these in-store visits once every three months, Mayne-Harrison communicated with her DM through voice mail messages about two to three times a day,

---

assistant store manager does not alter the fact that she made more money *per week* than the assistant store manager.

most of which were directed to all Store Managers in her district and distributed on a district-wide basis. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 105-107; Pl.'s Resp. [Doc. 75] at 5).

23.  At least three times a week Harrison would get a voicemail message from the district manager directed specifically to her. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 107).

24.  The store also received store mail weekly, which contains directions and tasks that need to be done in the store. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 201).

25.  The DM interviewed and hired employees for the assistant store manager and lead clerk position. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 30).

26.  Mayne-Harrison made recommendations to the DM for termination decisions, but the DM had the final authority as to terminations. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 31, 121-24, Mayne-Harrison 2010 Depo [Doc. 57-2] at 96).

27.  The DM determined how many employee labor hours to schedule each week. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 38).

28.  On at least one occasion the district manager changed the schedule, thinking an employee would be more useful working other hours, which would help truck day. ( Mayne-Harrison 2010 Depo [Doc. 57-2] at 228-230).

29.  Mayne-Harrison made recommendations to the DM as to which employees deserved a pay raise, but her recommendations were not always followed. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 74)

30.  The DM was in charge of handling worker's compensation issues. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 91-94).

31.  The DM was ultimately in charge of promoting store employees. (Mayne-Harrison

2010 Depo [Doc. 57-2] at 75).

32.     Mayne-Harrison went through the DM when there was a maintenance issue with the store. (Mayne-Harrison 2010 Depo [Doc. 57-2] 111-112).

33.     After a heavy snow, it was the district manager who called someone for snow removal services. ( Mayne-Harrison 2010 Depo [Doc. 57-2] at  82-83).

34.     The DM was in charge of advancing employees from part-time to full-time status (Mayne-Harrison 2010 Depo [Doc. 57-2] 220).

35.     Mayne-Harrison performed the following duties defined as "management" duties under the DOL regulations (*See* 29 C.F.R. § 541.102 (2000)):

        a.     interviewed and recommended employees for hire (Mayne-Harrison 2010 Depo [57-2] at 67:22-24 (Mayne-Harrison admits that she hired employees); 75-76 (Mayne-Harrison completed paperwork, conducted background checks, ensured store hours necessitated new hires, and, then, interviewed and selected applicants for hire); 76 (Mayne-Harrison never had a recommendation for hiring that was not accepted by her DM); 103-104 (Mayne-Harrison admits that hiring the right person for a position in her store was more important than just having someone to fill a space); 104-105 (Mayne-Harrison admits that if she hired a bad candidate, it would have an impact on the profitability of her store); 188-189 (Mayne-Harrison interviewed, selected and hired several employees during her tenure as Store Manager, and her DM "didn't have any input over the selection of those individuals"); 189-191 (Mayne-Harrison spent at least two hours interviewing and selecting employees each time she had an open position); 233 (Mayne-Harrison hired about 64 employees during the 5 years she was a Store Manager, which is approximately one per month); [Doc. 57-6] (Mayne-Harrison's resume lists "Hiring" as one of her duties as a

8

Manager at Dollar General));

      b.      trained employees (Mayne-Harrison 2010 Depo [57-2] at 54-55 (Mayne-Harrison hired employees and trained them in the best way she could to ensure store profitability); 68 (Mayne-Harrison developed employees on a continued basis by, for example, spending time talking with employees about proper customer service); 90-91 (Mayne-Harrison trained her store's employees on Dollar General's Employee Handbook); 92-93 (Mayne-Harrison admits that the time she spent initially training a new employee was not the only time she spent trying to develop good employees); 94 (Mayne-Harrison admits that training her store's employees on Dollar General's policies was important because policy violations could lead to termination); 150-151 (Mayne-Harrison reviewed store reports with her ASM as part of her ongoing training and development of her employees); 160 (Mayne-Harrison allowed her ASM to assist her in completing corporate paperwork as part of her development and training of the ASM); 170-171 (Mayne-Harrison trained her store's employees on a regular basis regarding proper food handling); 171-172 (Mayne-Harrison also would train her store's employees regarding proper maintenance of coolers that store food products); 193-195 (Mayne-Harrison spent at least 6 hours working side-by-side with each new employee in the store to train the individual on how to perform their job duties, such as stocking shelves, scanning items, running the cash register, and clocking in); 211-212 and [Doc. 57-7] (Mayne-Harrison received praise in her January 2000 performance evaluation because her "staff was trained well"); 212 and [Doc. 57-7] (Mayne-Harrison also received praise in her January 2001 performance evaluation for having a "well trained staff"); 231(Mayne-Harrison trained her store's employees on suggestive selling to increase sales per customer, such as the purchase of impulse items at the cash

registers); 231-232 (Mayne-Harrison admits that it was important to train her store's employees to be knowledgeable about the store's merchandise so that the employees knew how to suggestively sell); 232-233 (Mayne-Harrison spent time training and developing her store's employees to observe suspicious customer mannerisms that suggest the customer might be stealing); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 70-71 (Mayne-Harrison provided safety training to her store's employees regarding proper lifting before truck delivery days); 98 (Mayne-Harrison provided training to her store's employees regarding how to identify and deal with shoplifters));

c.      monitored and implemented legal compliance measures (Mayne-Harrison 2010 Depo [Doc. 57-2] at 87-88 (Mayne-Harrison admits that one of her responsibilities as Store Manager was to ensure that her store's employees understood and complied with Dollar General's anti-harassment, compensation, drug testing, and OSHA policies); 88 (Mayne-Harrison admits that per the store policies, she prevented her store's employees from working off the clock); 89 (Mayne-Harrison admits that she was responsible for ensuring that her store's employees reported their time accurately); 89 (Mayne-Harrison admits that she was responsible for enforcing all policies in Dollar General's Employee Handbook at a store level); 89-90 (Mayne-Harrison functioned as the HR representative of her store, so she would be responsible for properly handling employee complaints about harassment, ADA accommodation requests, and requests for medical leave under the FMLA); 90 (Mayne-Harrison admits that, as Store Manager, she needed to be knowledgeable about employment laws in order to enforce Dollar General's policies); 92 (Mayne-Harrison's duty to inform her store's employees of the policies contained in Dollar General's Employee Handbook was an ongoing process); 201-202 (Mayne-Harrison admits

that she was responsible for receiving product recalls in the store mail and for ensuring compliance with the recall notices, such as ensuring the products were removed from the store shelves); 207-208 (Mayne-Harrison admits that she had to be knowledgeable about company policies and hire consistent with West Virginia law because, if she did not, she could subject Dollar General to liability); 233-235 (Mayne-Harrison admits that she was responsible for ensuring compliance with federal regulations related to the acceptance of food stamps by, among other things, training her employees to understand the federal laws); 236 (Mayne-Harrison was responsible for ensuring that federal and state posters were posted in a common place as required by law for her employees to see));

d.      appraised employees' job performance ((Mayne-Harrison 2010 Depo [57-2] at 204-205 (Mayne-Harrison admits that, prior to 2001, she was responsible for performing written evaluations for the employees in her store); 205-206 (Mayne-Harrison admits that, after 2001, she continued to perform a written evaluation for her ASM and conducted oral evaluations with her employees, which made ongoing communication with her store employees about performance much more important); 205 (Mayne-Harrison admits that she took the employee evaluation process "seriously" because her evaluation dictated whether an employee would receive a raise, be promoted, or continue employment); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 147 (Mayne-Harrison took her "performance review responsibilities seriously"); 157 (Dollar General used Mayne-Harrison's evaluations of her employee's performance to determine which employees would receive raises);

e.      provided for security of the property (Mayne-Harrison 2010 Depo [Doc. 57-2] at 43-44 (Mayne-Harrison admits that she was the only store employee with a key to the back door of the store because it was her responsibility to secure the store property to

reduce theft));

       f.      provided for safety of the employees (Mayne-Harrison 2010 Depo [Doc. 57-2] at 148 (Mayne-Harrison communicated with employees about safety policies and expectations on a regular basis); 235-236 (Mayne-Harrison held safety meetings on a weekly basis to discuss safety procedures with her store's employees); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 70-71 (Mayne-Harrison provided safety training to her store's employees regarding proper lifting before truck delivery days)).

       g.      controlled budgets (Mayne-Harrison 2010 Depo [Doc. 57-2] at 60-61 (Mayne-Harrison spent most of the time she reviewed store reports analyzing expense data to ensure that her store was being charged with the right expenses); 62-63 (Mayne-Harrison admits that she needed to keep an eye on store reports to look for excessive refunds); 130 (Mayne-Harrison admits that she evaluated her store's needs on an ongoing basis to ensure she was scheduling enough employees to meet customer needs); 183 (Mayne-Harrison evaluated customer activity, truck unloading needs, and the skills of her employees in determining how and when to schedule the employees in her store); 210 (Mayne-Harrison received praise in her January 2000 performance evaluation for having "good control of expenses"); [Doc. 57-6] (Mayne-Harrison's resume lists "Controlling Payroll" and "Totaling and Extending invoices" as two of her duties as a Manager at Dollar General));

       h.      directed the work of employees (Mayne-Harrison 2010 Depo [Doc. 57-2] at 124-126 (on truck delivery days Mayne-Harrison directed her store's employees regarding who should run the register and take care of the front end of the store and who should assist with unloading the truck); 193-195 (Mayne-Harrison spent at least 6 hours working

side-by-side with each new employee in the store to show the individual on how to perform their job duties, such as stocking shelves, scanning items, running the cash register, and clocking in); 138 (Mayne-Harrison left lists and directions for her ASM or Third Key clerk regarding what needed to be done in the store on her days off and called twice each day that she was away from the store to check in with her store's employees); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 32 (Mayne-Harrison told her employees what to do in the store)); and

     i.    scheduled her employees (Mayne-Harrison 2010 Depo [Doc. 57-2] at 124-125 (Mayne-Harrison created the schedule for the employees and had discretion to determine how many employees were needed on a given day); 125-126 (Mayne-Harrison decided which employees ran the cash register, which employees were responsible for stocking merchandise, and which employees were responsible for unloading the trucks on delivery days); 183 (Mayne-Harrison spent 20-30 minutes every day creating the schedule for the employees in her store); 183 (Mayne-Harrison admits that she would give the most hours to her best employees); [Doc. 57-6] (Mayne-Harrison's resume lists "Schedules" as one of her duties as a Manager at Dollar General); *see also* Mayne-Harrison 2005 Depo [57-1] at 38-39 (Mayne-Harrison scheduled employees to most efficiently use her labor budget); *but see* Mayne-Harrison 2010 Depo. [Doc. 57-2] at 75 (DM determined how many employee hours to schedule)).

36.    Mayne-Harrison did not have the authority to interview or hire employees for the assistant store manager position or lead clerk position. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 30).

37.    Mayne-Harrison recommended employees for pay raises and promotions, and her

recommendations were accepted (Mayne-Harrison 2010 Depo [Doc. 57-2] at 73-74 (Mayne-Harrison recommended one of her clerks for promotion to ASM, and her recommendation was accepted); 74-75 (Mayne-Harrison recommended one of her clerks for promotion to Third Key clerk, and her recommendation was accepted); 75 (Mayne-Harrison admits that her DM never rejected her recommendation that a clerk be promoted to Third Key clerk or ASM); 146-147 (Mayne-Harrison recommended that an employee be given a raise, and the employee received a raise); 147 (Mayne-Harrison admits that her recommendations for promotions were accepted); 220 (Mayne-Harrison recommended that an employee be promoted from part-time to full-time, and her recommendation was accepted)).

38.    Mayne-Harrison's  recommendations that employees receive pay raises were not always followed.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 145 (Mayne-Harrison believes that she once recommended an employee receive a higher than usual starting rate of pay, but that recommendation was rejected); 147-48 (the DM was ultimately in charge of pay raises and promotions, as he could always refuse any recommendations); Mayne-Harrison 2005 Depo [Doc. 57-1] at 74 (Mayne-Harrison had no authority to give an employee a raise); Id. (Mayne-Harrison recommended that a couple of employees receive a raise, but the recommendations she made were not followed)).

39.    The DM would review the performance evaluations of store employees and would change them[5]. ( Mayne-Harrison 2005 Depo [Doc. 57-1] at 48).

_____

[5] It appears to the Court that the DM changed the bonuses, but not the performance reviews.  The Court will, however, in reviewing the facts in the light most favorable to plaintiff construe the plaintiff's statement in her deposition to pertain to changing the

40.     Mayne-Harrison did not set the pay rates of other employees in the store.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at  73 ( Mayne-Harrison had no authority to determine the starting rates of pay of employees); 75 (the DM was ultimately in charge of promoting store employees)).

41.     Additionally, Mayne-Harrison recommended employees for termination, and her recommendations were accepted.   (Mayne-Harrison 2010 Depo [Doc. 57-2] at 95-96 (Mayne-Harrison admits that she was responsible for reporting misconduct and recommending terminations to her DM); 96 (Mayne-Harrison admits that she was the person in the store who would observe and report conduct that leads to termination); 96 (Mayne-Harrison admits that was responsible for performing all counseling leading up to the point of termination); 96 (Mayne-Harrison admits that one of her responsibilities was recommending employees for termination); 96 (Mayne-Harrison also was responsible for informing an employee when s/he was terminated); 98 (Mayne-Harrison determined whether an employee was eligible for rehire); 217-218 (Mayne-Harrison was responsible for completing termination paperwork and making the decision as to whether a person would be rehireable); 222 (Mayne-Harrison decided that clerk should be terminated for not reporting to work for 3 consecutive days, notified her DM that the termination was taking place, and turned in the necessary paperwork to HR); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 109 (Mayne-Harrison's DM accepted her recommendation as to whether an individual was eligible for rehire); *but see* Mayne-Harrison 2005 Depo [Doc. 57-1] at 109 (Before making an employee eligible or ineligible for rehire, Harrison would consult with the

performance evaluations.

15

district manager)).

42.     Mayne-Harrison did not have the authority to terminate any store employee. (Mayne-Harrison 2005 Depo [Doc. 57-1] at  31; Mayne-Harrison 2010 Depo [Doc. 57-2] at 96).

43.     Mayne-Harrison testified she lacked the authority to terminate employees that quit coming to work. ( Mayne-Harrison 2010 Depo [Doc. 57-2] at  96; *but see* 222 (Mayne-Harrison decided that clerk should be terminated for not reporting to work for 3 consecutive days, notified her DM that the termination was taking place, and turned in the necessary paperwork to HR)).

44.     Mayne-Harrison's recommendations that an employee be terminated were not always followed.  (Mayne-Harrison 2005 Depo [Doc. 57-1] at 122-124 (Mayne-Harrison recommended to the DM that an employee be terminated, but the DM refused to terminate the employee, stating that the employee had not been written-up enough))

45.     An employee was once terminated without Mayne-Harrison's recommendation. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 77 (Mayne-Harrison immediately called the DM after an employee cursed her, and the DM decided to terminate the employee without Mayne-Harrison's recommendation); *but see* Mayne-Harrison 2010 Depo [Doc. 57-2] at 223 (Mayne-Harrison testified that the DM told her that the employees actions were insubordination and resulted in automatic termination, and Mayne-Harrison agreed with the DM).

46.     Harrison testified that the DM was in charge of the store, and that the DM informed her of what needed to be done in the store.  (Mayne-Harrison 2010 Depo. [Doc. 57-2] at 47, 51-52 (Harrison testified she was not in charge of the store, that she "was always told what to do," and that "I don't consider that being in charge of a store")).

47 .     Mayne-Harrison acknowledged that the duties outlined in the Store Manager Job Description are a fair and accurate overview of her duties and responsibilities while she was employed as a Store Manager for Dollar General. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 142-143 (Mayne-Harrison was responsible for the "management of all employees and effective planning and implementation of all store processes"); 144 (Mayne-Harrison was responsible for proper training for employees, conducting performance evaluations, and counseling employees, up to and including termination); 148 (Mayne-Harrison was responsible for communicating performance, conduct, and safety expectations to employees on a regular basis); 149 (Mayne-Harrison was responsible for ensure the store was properly staffed and effectively opened and closed each day); 150 (Mayne-Harrison was responsible for evaluating operating statements to identify business trends); 151-152 (Mayne-Harrison was responsible for ordering to ensure that her store met or exceeded "in-stock" targets); 154 (Mayne-Harrison was responsible for facilitating the efficient staging, stocking, and storage of merchandise); 154 (Mayne-Harrison was responsible for ensuring that all merchandise was presented in accordance with established company practices); 155 (Mayne-Harrison was responsible for maintaining accurate inventory levels); 156 (Mayne-Harrison was responsible for ensuring the financial integrity of her store); 159 (Mayne-Harrison was responsible for providing customer service and for maintaining a clean and well-organized store); 160 (Mayne-Harrison was responsible for completing store paperwork and documentation in accordance with company guidelines); *see also* [Docs 59-14, 59-15] (Dollar General Job Description for Store Manager), Mayne-Harrison 2005 Depo [Doc. 57-1] at 115-121 (Mayne-Harrison agrees that each of the duties listed in the Dollar General Job Description for Store Manager was part of her responsibility)).

48.     The ordering of store merchandise was performed automatically through Dollar General's automatic replenishment system. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 59; 60 (Mayne-Harrison and others would walk around the store and scan bar codes on the shelves and enter how many of a particular item the store had and Dollar General would replenish the inventory); 61 (Mayne-Harrison could order extra of items, but she never received them); Mayne-Harrison 2010 Depo [Doc. 57-2] at 133-34 (same)); Mayne-Harrison 2005 Depo [Doc. 57-1] at 61-62 (businesses would come into the store wanting to make special orders of merchandise and Mayne-Harrison tried to do the special order but it hardly ever worked); Mayne-Harrison 2010 Depo [Doc. 57-2] at 172-73 (Mayne-Harrison testified that 80% of her special orders, or add-on orders, were not delivered).

49.     The store was overstocked from the automatic replenishment system and Mayne-Harrison, with one other employee in the store, would spend an entire day in the stockroom counting merchandise. (Mayne-Harrison 2005 Depo [Doc. 57-1] at  63).

50.     Mayne-Harrison could not decide what items were sold in the store. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 135, 241) (Mayne-Harrison could not order merchandise that the store did not normally receive, even if Mayne-Harrison wanted to order them because she thought they would sell).

51.     Mayne-Harrison did not control what prices were charged for store merchandise. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 136, 241).

52.     Mayne-Harrison acknowledged that her DM never interfered with her ability to perform the duties outlined in the Store Manager Job Description.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 144 (Mayne-Harrison's DM did not interfere with her ability to recruit, solicit, and retain qualified employees); 144 (Mayne-Harrison's DM did not interfere with

her ability to train, appraise, and counsel employees); 148 (Mayne-Harrison's DM did not interfere with her ability communicate performance, conduct and safety expectations to employees in her store); 149 (Mayne-Harrison's DM did not interfere with her ability ensure her store was properly staffed); 150 (Mayne-Harrison's DM did not interfere with her ability to evaluate operating statements to identify business trends, including sales, profitability, and expense control); 151-152 (Mayne-Harrison's DM did not interfere with her ability to order merchandise to ensure that her store met or exceeded in-stock targets); 154 (Mayne-Harrison's DM did not interfere with her ability to facilitate efficient staging, stocking and storage of merchandise); 154-155 (Mayne-Harrison's DM did not interfere with her ability to ensure that all merchandise was presented in accordance with company practices); 155 (Mayne-Harrison's DM did not interfere with her ability to maintain accurate inventory levels); 156 (Mayne-Harrison's DM did not interfere with her ability to ensure the financial integrity of her store); 159 (Mayne-Harrison's DM did not interfere with her ability to provide superior customer services and maintain a clean and well-organized store); 160 (Mayne-Harrison's DM did not interfere with her ability to complete all store paperwork and documentation in a timely manner)).

53.     Moreover, Mayne-Harrison admits that her job as Store Manager was to oversee her store's operations, as well as her employees, and to ensure that her store was profitable. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 54-55; [Doc. 57-6] (Mayne-Harrison's resume lists "Manager up to 12 employees" and "Maintained high sale volume" as part of her responsibilities as a Manager at Dollar General)).

54.     Mayne-Harrison testified that she believed her ability to manage the store was limited because the restrictive labor budget left the store understaffed. (Mayne-Harrison

2005 Depo [Doc. 57-1] at 33 (Mayne-Harrison testified that there just was not enough payroll to direct store employees); 130 (Mayne-Harrison testified that even the DMs recognized that there were not enough payroll hours); 138 (Mayne-Harrison testified store employees were not properly trained because of the lack of time); 116 (Mayne-Harrison testified that the store lacked the payroll budget to ensure that store employees were properly trained, that "there wasn't enough time to be able to do that.") ; 40-42 (Mayne-Harrison would come in before the store opened and would stay after the store closed, performing tasks such as sweeping and mopping, because she was too busy during the day to get those tasks done); 96 ( Mayne-Harrison testified that the store's recovery was not in good condition when Mayne-Harrison left because she worked from 6 o'clock in the morning until 7 o'clock at night but there was not enough time to straighten the shelves); 115 (Mayne-Harrison testified that "for the store to be properly staffed you had to have the payroll and I believe that we did not have enough."); 118 (Mayne-Harrison testified that she "could not get the staff in that was needed for the store," and that "the staff was not full because we just did not have enough time to do everything.")).

55.    Mayne-Harrison testified that the restrictive labor budget resulted in her working in the store by herself regularly.  (Mayne-Harrison 2005 Depo [Doc. 57-1] at 39-40).

56.    Mayne-Harrison disciplined and counseled her employees. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 68 (Mayne-Harrison counseled employees regarding appropriate customer interaction because getting customers to return to the store was one way to improve sales); 94-95 (Mayne-Harrison admits that she was responsible for enforcing Dollar General's progressive counseling policy); 95 (Mayne-Harrison counseled employees appropriately so that she was prepared if it became necessary to recommend that an

employee be terminated); 109 (Mayne-Harrison counseled a clerk on 2-3 occasions after receiving customer complaints that the clerk was eating at the cash register and being rude); 224 (Mayne-Harrison performed progressive counseling on four employees after finding shortages in their cash registers); 225 (Mayne-Harrison counseled an employee for being rude after receiving a complaint from a customer); 225 (Mayne-Harrison's disciplinary write-ups to employees included an action plan with suggestions on ways to improve performance); 225-226 (Mayne-Harrison did not consult with her DM before issuing a disciplinary write-up to a store employee); 226-227 (Mayne-Harrison issued a write-up to her ASM for not doing a pickup for the excessive cash in her till, which was an important step to protecting company assets by reducing theft); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 167-168 (Mayne-Harrison issued a written counseling form to an employee for missing work without calling in, and informed the employee that if she did so again, she could be terminated)).

57.     Mayne-Harrison informed the district manager when an employee was counseled for the third time.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at  108-109).

58.     If a cash register was short $1,000, Harrison would have to go to the district manager. (Mayne-Harrison 2010 Depo [Doc. 57-2] at  158).

59.     Mayne-Harrison also ensured that her subordinates followed the company's policies and procedures.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 87-88 (Mayne-Harrison admits that one of her responsibilities as Store Manager was to ensure that her store's employees understood and complied with Dollar General's anti-harassment, compensation, drug testing, and OSHA policies); 89 (Mayne-Harrison admits that she was responsible for ensuring that her store's employees reported their time accurately); 89 (Mayne-Harrison

admits that she was responsible for enforcing all policies in Dollar General's Employee Handbook in her store); 92 (Mayne-Harrison's duty to inform her store's employees of the policies contained in Dollar General's Employee Handbook was an ongoing process); 233-235 (Mayne-Harrison admits that she trained her employees regarding the acceptance of food stamps in compliance with company policies and procedures)).

60.     Mayne-Harrison protected the company's assets by:

a.      controlling shrink in her store, including monitoring her store's inventory (Mayne-Harrison 2010 Depo [Doc. 57-2] at 59 (Mayne-Harrison reviewed inventory data on store reports to monitor the mount of inventory in the stock room and on the floor); 162-163 (Mayne-Harrison was responsible for ensuring that the store's inventory was correct, which took approximately 6 hours for each day that the store received new merchandise); 210 and [Doc. 57-7] (Mayne-Harrison received praise on her January 2000 performance evaluation for having "terrific" inventory shrink));

b.      watching the store for possible shoplifters (Mayne-Harrison 2010 Depo [Doc. 57-2] at 210-211 (Mayne-Harrison controlled inventory shrink monitoring the store for possible shoplifters);

c.      holding the only key to the back door (Mayne-Harrison 2010 Depo [Doc. 57-2] at 43-44 (Mayne-Harrison was the only store employee with a key to the back door because she was responsible for monitoring store theft and inventory shrink));

d.      training her store's employees to watch for suspicious behavior (Mayne-Harrison 2010 Depo [Doc. 57-2] at 210-211 (Mayne-Harrison controlled inventory shrink by training the employees in her store to identify potential shoplifters); 232-233 (Mayne-Harrison admits that one of the reasons she spent time training her employees was to

teach them to observe the store for potential theft));

e.      counseling employees for holding too much money in the cash register (Mayne-Harrison 2010 Depo [Doc. 57-2] at 226-227 (Mayne-Harrison issued a write-up to her ASM for not doing a pickup for the excessive cash in her till, which was an important step to protecting company assets by reducing theft); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 98 (Mayne-Harrison provided training to her store's employees regarding how to identify and deal with shoplifters));

f.      managing her store's refunds and exchanges (Mayne-Harrison 2010 Depo [Doc. 57-2] at 62-63 (Mayne-Harrison analyzed store reports to identify and investigate any excessive refunds); 63-64 (Mayne-Harrison focused on excessive refunds as a shrink control method because they were an indicator of employees sliding merchandise by scanning and charging a customer for an item but keeping the item for themselves));

g.      marking down the price on damaged merchandise rather than disposing of it (Mayne-Harrison 2005 Depo [Doc. 57-1] at 105-107 (Mayne-Harrison tried to minimize shrink by selling damaged merchandise at a reduced price, rather than disposing of it, when it could be done safely)); and

h.      by reviewing store reports and end of shift reports on a daily and weekly basis (Mayne-Harrison 2010 Depo [Doc. 57-2] at 55-56 & Store Reports [Doc. 57-5] (Mayne-Harrison received store reports, which were "important" for determining store performance, expenses and costs, and she analyzed these reports on a weekly basis); 174-176 (Mayne-Harrison review and analyzed many different reports, including weekly sales and cash analysis reports, daily transaction reports, consolidated sales analysis reports)).

61.      Mayne-Harrison was responsible for ensuring that new hire paperwork, and all other

daily store paperwork, was completed properly and forwarded to the corporate office as required per Company policy. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 30 (Mayne-Harrison was responsible for reporting workplace injuries, including workers' compensation claim paperwork, to the corporate office); 167-168 (Mayne-Harrison admits that she always performed management duties, such as auditing and completing store paperwork and sealing and unsealing the delivery truck); 173 (Mayne-Harrison was responsible for completing monthly transaction sheets, recording daily sales, and preparing price statements for vendors); 179-180 (Mayne-Harrison spent at least 30 minutes each day completing Company paperwork and documentation); 185 (Mayne-Harrison completed employment forms and I-9s for 58 employees that she hired during her tenure as Store Manager); 192-193 (Mayne-Harrison was responsible for completing new hire paperwork, including background checks); 201 (Mayne-Harrison spent 20 minutes each day sorting through store mail, which included notices from the corporate office); 216-217 (Mayne-Harrison was responsible for completing personnel action forms, including any changes with an employee's name, address, phone number, rate of pay, position, or other aspects of employment); 217-218 (Mayne-Harrison was responsible for completing termination paperwork and making the decision as to whether a person would be re-hireable); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 103 (Mayne-Harrison was responsible for completing W-2 forms, I-9 forms, and other new hire paperwork)).

62.     Harrison worked an average of 70 hours per week. (Mayne-Harrison 2010 Depo at 55).

63.     Harrison spent 4 hours per week completing paperwork, and much of the paperwork was completed at home, such as filling out the store schedule. (Mayne-Harrison 2010

Depo at 180, 183; Mayne-Harrison 2005 Depo. 101-102, 104).

64.    Mayne-Harrison was the person who received complaints from her store's employees.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 89-90 (Mayne-Harrison functioned as the HR representative of her store, so she would be responsible for properly handling employee complaints about harassment, ADA accommodation requests, and requests for medical leave under the FMLA)).

65.    Harrison's three-day training to become a certified store manager consisted of her going to another Dollar General store and working with another store manager.  She testified she mostly unloaded the delivery truck. ( Mayne-Harrison 2005 Depo [Doc. 57-1] at 27).

66.    Harrison did not receive any training or material with respect to employment laws or worker's compensation prior to becoming a store manager. ( Mayne-Harrison 2005 Depo [Doc. 57-1] at 28).

67.    When there were worker's compensation injuries at the store, Harrison notified the DM and called Dollar General's risk management. ( Mayne-Harrison 2005 Depo [Doc. 57-1] at  91-94; Mayne-Harrison 2010 Depo [Doc. 57-2] at  27-28).

68.    Mayne-Harrison was held responsible for the overall performance of her store, was held accountable for getting things done, and was answerable to her DM if her store was not in good shape.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 54-55 (Mayne-Harrison admits that the overriding goal of her employment was to make sure her store was profitable); 133-135 (Mayne-Harrison improved her store's profitability by customizing store merchandise to encourage impulse purchases, securing several food pantry accounts, and hiring good employees); 157-158 (Mayne-Harrison admits that her responsibilities as Store

25

Manager were different from other employees because a clerk is responsible only for his assigned register, while she was ultimately responsible for all the registers); 184 (Mayne-Harrison admits that the success of a store depends heavily on the decisions that a Store Manager makes regarding who to hire and how staff the 237 hours of work in the store); 226 (Mayne-Harrison admits that her DM would be responsible for writing her up for poor performance); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 51 (Mayne-Harrison was responsible for running her store); 172 (Mayne-Harrison felt that Dollar General held her accountable for the overall profitability of her store)).

69.     Most of the placement of merchandise in the store was determined by Dollar General corporate headquarters through its "planogram." (Mayne-Harrison 2005 Depo [Doc. 57-1] at 68); Mayne-Harrison 2010 Depo [Doc. 57-2] at 168 (90% of the placement of seasonal items was determined by Dollar General corporate headquarters through its monthly planner); 180 (most of the cap shelves and end caps were planogrammed); Mayne-Harrison 2005 Depo [Doc. 57-1] at 124-125 (Mayne-Harrison had no discretion over the placement of store merchandise because she had to follow the planogram and monthly planner, both of which dictated placement of merchandise in the store, and the store had no "flex" space)).

70.     The district managers would come by the store and make suggestions, such as how to make more room within the store. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 87-88).

71.     Mayne-Harrison could not unilaterally determine, write, or implement any policies or procedures. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 240).

72.     Recognizing the importance of her position, Mayne-Harrison admitted that her store could not have functioned without someone like her in the Store Manager position.

(Mayne-Harrison 2010 Depo [Doc. 57-2] at 199-200 (Mayne-Harrison admits if the Store Manager's duties were not performed, the store "would probably close"); 215 (Mayne-Harrison admits that no one had a greater impact on the store than she did as Store Manager)).

73.     During her time as a store manager, Mayne-Harrison would be asked to go to other Dollar General stores to perform duties for a couple of days, and sometimes a week. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 34-35; Mayne-Harrison 2010 Depo [Doc. 57-2] at 114)

74.     When Mayne-Harrison was not in her store, she would leave instructions for her store's employees, including leaving lists of tasks to complete. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 138 (Mayne-Harrison left lists and directions for her ASM or Third Key clerk regarding what could be done in the store on her days off)).

75.     When she was not in the store, Mayne-Harrison often received calls from employees in the store and gave them guidance on managerial issues, such scheduling, or other issues they did not know handle.  (Mayne-Harrison 2005 Depo [Doc. 57-1] at 99-101 (on her days off, Mayne-Harrison received calls regarding scheduling issues, various problems in the store, such as registers not working, and other issues that her store's employees did not know handle without her direction)).

76.     Mayne-Harrison also would call the store to check-in twice each day that she was not in the store.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 138; *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 99).

77.     Mayne-Harrison testified that she did pretty much the same thing every day, which is "went in and stocked."  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 129).

78.     Mayne-Harrison performed non-managerial duties such as stocking the shelves, running the cash register, cleaning the store, recovering the store, cleaning up the parking lot, and taking out the trash. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 195).

79.     Mayne-Harrison testified that she was not always thinking about running the store, but rather when she was performing a task such as stocking the shelves she was just thinking about stocking the shelves. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 196).

80.     Mayne-Harrison was given a restrictive labor budget for the scheduling of employees.  ( Mayne-Harrison 2005 Depo [Doc. 57-1] at  38; Mayne-Harrison 2010 Depo [Doc. 57-2] at  69).

81.     Harrison could not unilaterally determine how many employees that the store needed. ( Mayne-Harrison 2010 Depo [Doc. 57-2] at 240-41).

82.     Mayne-Harrison testified that the store operated under too few labor hours. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 143).

83.     Often, there was only Mayne-Harrison and one other employee in the store and they would both be running a cash register. (Mayne-Harrison 2005 Depo [Doc. 57-1] at  33).

84.     Mayne-Harrison would come in before the store opened and would stay after the store closed, performing tasks such as sweeping and mopping, because she was too busy during the day to get those tasks done.  (Mayne-Harrison 2005 Depo [Doc. 57-1] at  40).

85.     Mayne-Harrison testified that the store employees complained about the restrictive labor budget and wondered how anything was supposed to get done. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 40).

86.     The store received two delivery trucks a week (Mayne-Harrison 2005 Depo [Doc. 57-1] at  69), and each truck delivery contained approximately 1,000 pieces of

merchandise. (Mayne-Harrison 2010 Depo [Doc. 57-2] at  123).

87.      Dollar General's policy to have the store stocked 24 hours following a truck delivery, but it took Harrison and the other store employees about two days to stock the shelves after a truck delivery. (Mayne-Harrison 2010 Depo [Doc. 57-2] at 230; 124 (the store "always had a problem" getting the truck unloaded and stocked)).

88.      Mayne-Harrison remained responsible for managing her store—even when she was busy with other non-managerial tasks.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 164-165 (Mayne-Harrison admits that even when she was stocking shelves, she would check on other shelves to make sure they were stocked correctly and perform other management duties, such as receiving new merchandise from vendors); 167-168 (Mayne-Harrison admits that even while assisting other clerks unloading trucks, she also was performing other management duties, such as meeting drivers, completing store paperwork, sealing and unsealing the truck, and auditing the paperwork)).

89.      Mayne-Harrison admits that as a Store Manager she never stopped managing her store because she was "the one in charge."  (Id.  *See also* Mayne-Harrison 2010 Depo [Doc. 57-2] at 53 (Mayne-Harrison admits that she was "the one in charge" of the store and that she would go to her DM if an issue came up that she could not answer, which did not happen very often); 195 (Mayne-Harrison admits that she never stopped being the manager of the store, even when performing other non-managerial functions, such as stocking, running the cash register, or cleaning)).

90.      Regardless of what task she was performing, Mayne-Harrison was always monitoring the cash register, monitoring, stocking, trying to run the store in the most profitable manner, and looking for ways to develop her employees, which she testified was

an ongoing process.  (Id. *See also* Mayne-Harrison 2010 Depo [Doc. 57-2] at 68; 195, 197).

91.     Mayne-Harrison's ASMs did not have authority to hire employees, discipline other employees, evaluate other employees, recommend terminations, submit payroll, or other functions associated with employee retention.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 44; 76; 144; 159 (Mayne-Harrison admits that to the extent her ASM performed any managerial tasks, she did so at Mayne-Harrison's direction and based on the training Mayne-Harrison had given the ASM); *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 19 (when Mayne-Harrison was an ASM, she performed managerial tasks, such as payroll and scheduling, only at her Store Manager's direction)).

92.     The assistant store manager issued a progressive counseling when Mayne-Harrison was on vacation. (Mayne-Harrison 2005 Depo [Doc. 57-1] at 161:6-11, 2005.) The assistant manager did not speak with Harrison before issuing the progressive counseling, but did contact the district manager. ( Mayne-Harrison 2005 Depo [Doc. 57-1] at  161).

93.     In addition, when Mayne-Harrison was an ASM she never interviewed, hired, disciplined or terminated anyone.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 41-42; *see also* Mayne-Harrison 2005 Depo [Doc. 57-1] at 19-20 (as an ASM, Mayne-Harrison never interviewed applicants and did not have the authority to discipline other employees)).

94.     Mayne-Harrison consented to bringing an FLSA claim against Defendant in March of 2004.  (Mayne-Harrison 2010 Depo [Doc. 57-2] at 24-25; see also Consent to Become Party Plaintiff [Doc. 57-8]).

## IV. DISCUSSION

### A. DEFENDANT'S MOTION TO STRIKE

#### 1. Standard of Review

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.R. 12(f). "[M]otions under 12(f) are viewed with disfavor by the federal courts and are infrequently granted," and are only granted with the challenged pleading has "no possible relation or logical connection to the subject matter of the controversy" or "cause some form of significant prejudice to one or more parties to the action. 5C Charles A. Wright & Arthur Miller, FEDERAL PRACTICE & PROCEDURES §§ 1380. 1382 (West 2009); *see also Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001).

#### 2. Motion to Strike Improper Evidence

On June 25, 2010, defendant filed a Motion to Strike and Objections to Evidence Offered in Support of Plaintiff's Common Response in Opposition to Defendant's Individual Motion for Summary Judgment [Doc. 78]. In the Motion, defendant argues that Plaintiff's Common Exhibits 1, 2, 7-20, 42, and 46, the "Store Survey" are improper because they lack foundation. (Id. at 3). Additionally, defendant moved to strike Plaintiff's common Exhibits 4, and 47 which are articles about Dollar General. Defendants object to the Court's consideration of these articles because one was published after Mayne-Harrison left Dollar General, and both articles include hearsay and other inadmissable information. Finally, defendant objects to Plaintiff's Common Exhibits, 3, 22, 24, 25, 27-29, "Dollar

General Story Newsletters".  Defendant objects to these on the grounds that they lack foundation with regard to the specifics in the above-styled case.  Defendant notes that the newsletters summarize information from other locations, and other employees of Dollar General and that this Court's inquiry should be into the specific facts and circumstances surrounding *plaintiff's* employment.  The Court will address each group of documents in turn.

First, the Court finds that the Store Survey documents (Plaintiff's Common Exhibits 1, 2, 7-20, 42, and 46) are admissible.  Defendant argues that they lack foundation because the Store Survey did not include plaintiff's store, and because the hours spent performing manual labor tasks are not broken down by position within the store (clerk, manager, assistant manager, etc.).  While defendant's objections are correct, defendant is also assuming the purpose for which plaintiff submitted the documents.  The documents may lack foundation to show the specific hours worked by plaintiff Mayne-Harrison, but are relevant to show the knowledge of Dolgencorp with regard to any good faith claims.  Additionally, the Store Surveys can be used as a tool to better understand the nature of the operations of the Dollar General stores in general.  Accordingly, defendant's Motion to Strike Plaintiff's Common Exhibits 1, 2, 7-20, 42, and 46 is **DENIED**.

Second, defendant moved to strike Plaintiff's common Exhibits 4, and 47 which are articles written about Dollar General.  The Court finds that the articles are irrelevant and should be struck from the record.  Plaintiff argues that the articles are not offered for the truth of the matter asserted, but instead are being offered to show the company's "state of mind" and what Dollar General "truly valued." ([Doc. 80] at 6).  The Court cannot find that academic articles written by non-employees of the defendant can go to show the state of

mind of the defendant, nor what the company 'truly valued.'  Accordingly, the Court finds

that defendant's Motion to Strike Plaintiff's Common Exhibits 4, and 47 should be

**GRANTED** and that Plaintiff's Common Exhibits 4, and 47 should be, and hereby are,

**STRUCK** from the record.

Finally, defendant objects to the "Dollar General Story Newsletters" which are

monthly newsletters Dollar General sent to its employees.  Defendant argues that these

letters should not be considered by this Court as they do not address the specifics of

plaintiff's store.  In response, however, plaintiff notes that the letters fit within the business

records exception.  Fed.R.Civ.P. 803(6).  The Court agrees, and finds pursuant to Rule

803(6) that the letters fit within an exception to the hearsay rule.  Additionally, plaintiff

argues that the letters are not merely submitted for the truth of the matter asserted but also

go to show the 'state of mind' of Dollar General and its awareness of the conditions in its

stores.  The Court also agrees with this reasoning, and accordingly finds that defendant's

Motion to Strike Plaintiff's Common Exhibits, 3, 22, 24, 25, 27-29, should be, and hereby

is **DENIED**.

## B.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 1.    Standard of Review

The moving party is entitled to summary judgment where "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See Charbonnages de*

*France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  A genuine issue exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the nonmoving party and to view the facts in the light most favorable to the nonmoving party. ***Anderson***, 477 U.S. at 255. The moving party has the burden to show an absence of evidence to support the nonmoving party's case. ***Celotex Corp. v. Catrett***, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. ***Anderson***, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. ***Id.*** at 252.

2.     Fair Labor Standards Act

The Fair Labor Standards Act ("FLSA") requires employers to pay overtime to employees who work more than forty hours per week. 29 U.S.C. § 207(2). Employees working in a "bona fide executive, administrative, or professional capacity" as defined by regulations promulgated by the Secretary of Labor are exempt from the FLSA overtime requirements. 29 U.S.C. § 213(a)(1). FLSA exemptions should be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakable within [the exemptions'] terms and spirit." ***Arnold v. Ben Kanowsky, Inc.***, 361 U.S. 388, 392 (1960).

The regulations accompanying the FLSA provide for a "long test" and a "short test." *See* 29 C.F.R. § 541.1. The short test applies when an employee is paid more than $250.00 per week. Id; *see also* ***Jones v. Virginia Oil Co.,*** 69 Fed.Appx. 663, 636 (4th Cir.

34

2003). Here, the parties and this Court all agree that the short test is the applicable standard[6]. (*See* UMF 8-10).

### 3. Exemption Under the FLSA "Short Test"

"An employee is exempt under the executive exemption's short test if: (1) the employee's primary duty consists of the management of the enterprise or of a customarily recognized department or subdivision thereof, and (2) the employee customarily and regularly directs the work of two or more other employees." *Jones*, 69 Fed.Appx. at 636 (Citing 29 C.F.R. § 541.119(a); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 250 (4th Cir.2000)). Here, the parties agree that Mayne-Harrison supervised more than two employees and engaged in managerial work[7]. (UMF 1, 6, 35). Thus, the only issue before

---

[6] The pre-2004 regulations set forth both a "short" and "long" test for determination whether an employee qualifies as an exempt executive. See 29 C.F.R. § 541.1 (pre-2004). The short test is used for employees who are compensated on a salary basis at a rate of at least $250 per week. 29 C.F.R § 541.1(f) (pre-2004). It is undisputed that Mayne-Harrison earned a salary of more than $250 per week during the relevant time period. Accordingly, the short test is appropriate method for determining whether Mayne-Harrison was properly classified as exempt. The current regulations provide that an employee qualifies as an executive if: (1) she is compensated on a salary basis at a rate of at least $455 per week; (2) her primary duty is management of the enterprise; (3) she customarily and regularly directs the work of two or more other employees; and (4) she has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

[7] Pursuant to 29 C.F.R. § 541.102(b), management includes the following: activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees;

the Court is whether Mayne-Harrison's "primary duty" was management of the Kingwood store.

The regulations accompanying the FLSA set forth five factors for determining whether management is an employee's primary duty: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid other employees for non-exempt work. 29 C.F.R. § 541.103; *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993). The Court will address each factor in turn.

a.    Time Spent on Managerial Duties

The regulations state that the Court should consider the amount of time spent in the performance of managerial duties in determining whether an employee's "primary duty" is management. 29 C.F.R. § 541.103. Specifically, the regulations state that as a "rule of

maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

thumb," an employee who spends over 50 percent of her time in management has management as her primary duty. Id. "Time alone [, however,]... is not the sole test, and in situations where the employee does not spend over 50 percent of [her] time in managerial duties, [she] might nevertheless have management as [her] primary duty if the other pertinent factors support such a conclusion." Id. Thus, the amount of time spent on non-managerial tasks is not dispositive, "particularly when non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial." *Horne v. Crown Central Petroleum, Inc.*, 775 F.Supp. 189, 190 (D.S.C.1991). See also [Doc. 60-20] *Noble v. Dolgencorp, Inc.*, No. 5:09-cv-49 (S.D. Miss. May 11, 2010) (stating "[a]n employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work."); [Doc. 60-11] *Grace v. Family Dollar Stores, Inc.*, 2009 U.S. Dist. LEXIS 59154, at *10 (W.D.N.C. July 9, 2009) (granting defendant's motion for summary judgment where store manager testified that 99% of her time was spent on "putting out freight, running a cash register, doing schematics, and doing janitorial work."); [Doc. 60-8] *Fipp v. Family Dollar Stores*, No. 2:03-721-18BG, at 9 (D.S.C. Sept. 27, 2004) (granting defendant summary judgement based in part on finding that concurrent performance of exempt and non-exempt duties does not preclude the application of executive exemption).

"How an employee spends her time working is a question of fact, while the question of whether the employee's particular activities exclude her from the overtime benefits of the FLSA is a question of law." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714

(1986). An employee will have management as her primary duty if while engaged in nonexempt work, the employee also "supervises other employees, directs the work of warehouse and delivery men, ... handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require." 29 C.F.R. § 541.103. *See also* **Smith**, 202 F.3d at 250-51. In fact, "a number of federal courts have disregarded the time factor of the short test where the manager is in charge of a separate facility such as a convenience store or restaurant chain." **Haines v. S. Retailers, Inc.**, 939 F.Supp. 441, 449 (E.D.Va. 1996) (internal quotation marks and citation omitted). *See, e.g.*, **Murray v. Stuckey's, Inc.**, 939 F.2d 614, 618-20 (8th Cir.1991) (Stuckey's manager met the "primary duty" test even though 65-90 percent of the manager's time was spent on nonmanagerial duties); **Donovan v. Burger King Corp.**, 675 F.2d 516, 521-22 (2d Cir.1982) (relying on § 541.103 to hold that Burger King assistant managers had "primary duty" of management despite over 50 percent of their time was spent on routine matters); **Donovan v. Burger King Corp.**, 672 F.2d 221, 226-27 (1st Cir.1982) (same). *But see* **Cowan v. Treetop Enters., Inc.**, 120 F.Supp.2d 672, 690-91 (M.D.Tenn.1999) (noting foregoing line of cases but holding that unit managers at franchise restaurant were not bona fide executives).

Viewing the facts in the light most favorable to Mayne-Harrison, the record demonstrates that she spent over half of her time performing non-managerial work. Mayne-Harrison testified that she spent as much as 95 percent[8] of her time performing non-

---

[8] Mayne-Harrison testified she worked on average of 70 hours per week, and spent about 4 hours a week completing paperwork. (4/70= 0.05)

managerial tasks. (UMF 62-63, 77-78, 83-84). However, even assuming that Mayne-Harrison spent the bulk of her time performing non-managerial tasks such as stocking the shelves, unloading the shipment truck, cleaning the store, and manning the cash register, the record reflects that Mayne-Harrison could simultaneously perform many of her management tasks. (UMF 88-90). That is, while Mayne-Harrison was doing non-managerial tasks, she also engaged in the supervision of employees, handled customer complaints, dealt with vendors, and completed daily paperwork. Thus, time spent performing managerial duties is not determinative in Mayne-Harrison's case, and the Court must consider the other factors in the "primary duty" test. *See* 29 C.F.R. § 541.103

b. The Importance of Mayne-Harrison's Managerial Duties

In order to determine an employee's primary duty, the Court must also consider the relative importance of an employee's managerial tasks to her non-managerial work. 29 C.F.R. § 541.103. "[C]ourts frame[ ] this query as a measure of the significance of the managerial tasks to the success of the facility." **Haines**, 939 F.Supp. at 450. The Court in **Grace** defined primary duty this way: "the principal, main, major or most important duty that the employee performs and the major emphasis should be on the character of the employee's job as a whole." [Doc. 60-11] **Grace**, 2009 U.S. Dist. LEXIS 59154, at *10.

For example, the Court should consider whether the business in question could have operated as successfully without the managerial tasks carried out by the 'exempt' employee. *See* **Donovan**, 675 F.2d at 521 (noting the assistant managers determined the amount of food to be prepared, ran cash checks, scheduled and supervised employees, and checked inventory, and that the restaurant could not have operated successfully in the

absence of those tasks). In a recent district court opinion, the court framed the matter this way: "[i]f [the] plaintiff did not perform her nonmanagerial duties, her Dollar General store may not have functioned well; but if she did not perform her managerial duties, the store would have been incapable of doing business." *King v. Dolgencorp, Inc.*, No. 3:09-cv-00146, at 20 (M.D. Pa. May 6, 2010).

Additionally, many courts look to a manager's training, evaluation, and factors affecting eligibility for bonuses and pay raises. *See* *Addison v. Ashland Inc.*, 2006 U.S. Dist. LEXIS 59154, at *21 (W.D.N.C. July 9, 2009) (noting plaintiff's performance evaluation, her salary, and her bonus depended on her handing of customers and also on her store's profitability, and finding those factors relevant to the "importance" of her managerial duties); *Moore v. Tractor Supply Co.*, 325 F.Supp.2d 1268, 1275 (S.D.Fla. 2004), *aff'd* 2005 U.S. App. LEXIS 14191 (11th Cir. July 12, 2005) (noting that the employer placed a high value on the employee's management activities because: "the better the store performed, the higher plaintiff's year end-bonus," and the plaintiff "alone was responsible for increasing margins and profits and for devising ways to increase foot traffic and, in turn, sales."); *Horne v. Crown Central Petroleum*, 775 F.Supp. 189, 191 (D.S.C. 1991) (finding the importance of plaintiff's managerial activities indicated by that store manager's eligibility for "bonuses tied to [the plaintiff's] store's profitability").

Here, Mayne-Harrison was responsible for a number of managerial tasks, including hiring, scheduling, training, and disciplining employees, checking inventory and ordering supplies, handling customer complaints, counting daily receipts, and making bank deposits. (UMF 35, 47, 60). Mayne-Harrison also acknowledged that she was "the one in charge"

at the store, and that she never stopped managing her store even when performing non-managerial tasks. (UMF 88-89). Further, when Mayne-Harrison was not in the store she still directed the employees and called to make sure that tasks were being performed. (UMF 74-76). Additionally, plaintiff Mayne-Harrison's salary and bonuses were tied to the store's performance. Specifically, bonuses were based on the store meeting its quarterly and annual sales goals, minimizing inventory shrink and controllable expenses, and maximizing profits. (See [Doc. 64-33], "Teamshare" Bonus Plan; [Doc. 59-30], Bass Depo at 55). It is also important to note that while Mayne-Harrison might receive a bonus for the performance of the Kingwood store, the District Manager–who oversaw several stores–might not receive a bonus for store performance. (See [Doc. 60-6], Pryor Declaration ¶ 3).

Based on a review of the facts in the light most favorable to plaintiff, therefore, this Court finds that "the [regular employees] merely rowed the boat; [and Mayne-Harrison] charted and steered its course." *Horne*, 775 F.Supp. at 191; *see also, e.g., Murray*, 939 F.2d at 619-20, *Donovan*, 675 F.2d at 521; *Haines*, 939 F.Supp. at 450; *Stricker v. E. Off Road Equip.*, 935 F.Supp. 650, 654 (D.Md.1996) ("Store managers are frequently held to be exempt under the executive category"). If Mayne-Harrison had not performed her non-managerial tasks her store may not have performed well; but if she had not performed her managerial functions (e.g. hiring, scheduling, training, and disciplining employees, checking inventory and ordering supplies, handling customer complaints, counting daily receipts, and making bank deposits) the store would not have operated at all. Thus, the undisputed facts in the record demonstrate that Mayne-Harrison's managerial functions were critical to the

success of the Kingwood Dollar General Store.

> c. The Frequency With Which Mayne-Harrison Exercised Discretion and Her Freedom from Supervision

Next, the Court will consider the third and fourth primary duty factors: the frequency with which Mayne-Harrison exercised discretionary power; and her relative freedom from supervision. *See* **Haines**, 939 F.Supp. at 450 (noting overlap of these two factors). The exercise of "discretionary powers" is displayed by "the employee who normally and recurrently is called upon to exercise and does exercise discretionary powers in the day-to-day performance of his duties." 29 C.F.R. § 541.107(b).

Here, defendant has presented the Court with Mayne-Harrison's own testimony that she regularly exercised discretionary powers. For example, Mayne-Harrison had the discretion to hire, train, schedule, and discipline employees. (UMF 35). Mayne-Harrison also had the discretion to handle customer complaints, and mark down damaged merchandise. (UMF 60). The record also reflects that Mayne-Harrison's discretion in running the day-to-day operations of the store was not constrained by supervisors. (UMF 52, 20-24). The only favorable evidence cited by Mayne-Harrison is that the district managers had the ultimate authority in regard to firing employees, and setting the labor hour budget. (UMF 25, 27, 31, 34, 42). Mayne-Harrison admits, however, that her recommendations with regard to hiring and firing employees were almost always followed. (UMF 41,44, 45).

The record also does not reflect that upper management heavily supervised Mayne-Harrison's work. (UMF 52, 20-24). Rather, Mayne-Harrison was typically the senior-most person on the job site. (Id.) Mayne-Harrison testified that she saw the District Manager

about once every three months for about two hours, and that most of the time the District Manager was in the store he was on the phone. (UMF 20-21). Further, Mayne-Harrison performed many management duties with little to no oversight from the District Manager. (UMF 35) (interviewed and recommended employees for hire; trained employees; monitored and implemented legal compliance measures; appraised employee's job performance; provided for security of the property; provided for the safety of the employees; controlled budgets; directed the work of employees; and scheduled her employees).

Thus, Mayne-Harrison was "vested with enough discretionary power and freedom from supervision to qualify for the executive exception." **Haines**, 939 F.Supp. at 450. *See also* **Meyer v. Worsley Cos., Inc.**, 881 F.Supp. 1014, 1020-21 (E.D.N.C.1994); **Horne**, 775 F.Supp. at 191 (Finding exercise of discretion where supervisor "came by the store only a few times a week" and it was "up to [the plaintiff] to solve problems and make decisions when they arose." Also noting that the fact that "[d]efendant's store managers do have detailed policies and procedures to follow concerning store operations," does not "negate the significance of [the plaintiff's] exercise of discretion as the person solely in charge of the store.") ; **Murray**, 939 F.2d at 619 ("Like other courts that have considered the question, we believe that the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity.");**Thomas v. Speedway SuperAmerica**, 506 F.3d 496, 507 (6th Cir. 2007) (noting that despite the constant availability of the district manager to the store managers,

the fact that the district manager was in the store once or twice a week, and was frequently in touch via phone and email, that plaintiff was relatively free from supervision); *Kastor v. Sam's Wholesale Club*, 131 F. Supp.2d 862, 868 (N.D.Tex. 2001) (court granted summary judgment in favor of defendant where bakery manager exercised discretion in scheduling employees, communicating direction to his employees, delegated tasks, recommended disciplinary action, and determined when to order products and supplies); *Bosch v. Title Max*, 2005 U.S. Dist. LEXIS 5034, at *28-29 (N.D. Ala. Feb. 4, 2005) (stating "it is virtually impossible to conceive of a free standing business location without a 'manager.' Title Max, could not, and did not, manage by remote control."); *Jackson v. Advance Auto Parts, Inc.*, 362 F.Supp.2d 1323, 1335 (N.D.Ga. 2005) (finding that even though store managers were in store daily and available by phone, this did not render assistant store managers non-exempt).

        d.      <u>Mayne-Harrison's Salary as Compared to Other Employees</u>

Finally, the Court must consider the relationship between the employee's salary and the wages paid other employees for non-exempt work. 29 C.F.R. § 541.103. During her tenure as Store Manager Mayne-Harrison was paid significantly more than the hourly employees, including the Assistant Store Manger. In 2001, Mayne-Harrison was initially paid a salary of $370 per week. (UMF 8). Mayne-Harrison received raises from her starting salary, and in 2002, was paid a salary of $423 per week. (UMF 9). At the time of her resignation in 2004, Mayne-Harrison was paid $598 per week, or an annual salary of $31,096. (UMF 10). Additionally, Mayne-Harrison also was eligible for, and received, a bonus based on the performance of her store. (UMF 12). In 2001, Mayne-Harrison

received a $13,000 bonus, which was approximately forty-percent of her total compensation for the year. (UMF 13-14). In 2002 and in 2003, Mayne-Harrison received a $10,000 bonus. (UMF 15). In 2004, the last year Mayne-Harrison worked for Dollar General, she received a $5,681 bonus. (UMF 16).

During Mayne-Harrison's employment as Store Manager, the ASM in her store, who was an hourly employee, earned about $7.00 per hour, which was approximately $280 per 40-hour workweek. (UMF 17). The ASM was not eligible for the same type or amount of bonuses as the Store Manager, and, during Mayne-Harrison's employment as Store Manager, the ASM in her store never received a bonus of more than $500.20. (UMF 18).

Using the $7.00 per hour figure, if an hourly employee worked 40 hours per week, her pay would be $280.00 per week. If an hourly employee worked 70 hours per week (what Mayne-Harrison states she typically worked), her pay would be $595.00 per week. Based on salary alone, when accounting for all hours that Mayne-Harrison states she worked, it appears she did not earn significantly more than her ASM.

The Court must also consider, however, that salary was not the totality of Mayne-Harrison's compensation. *See e.g.* ***Donovan v. Waffle House***, 1983 U.S. Dist. LEXIS 13420 at *11 (N.D. Ga. Sept., 26, 1983) ("[t]here must be some reason other than an intent to subvert the Fair Labor Standards Act for the employer to pay them that much or give them the opportunity to earn that much.") Mayne-Harrison was also eligible for–and received bonuses based on her performance and the performance of her store. (UMF 12-16). Between 2001 and 2004, Mayne-Harrison's bonuses ranged from about $5,600.00-$13,000 (between $107.00-$250.00 per week). (Id.) The only other person who was eligible for a significant bonus was the ASM. The largest bonus received by the ASM was

$500.20–or an additional $9.62 per week.  (UMF 18).  Thus, in order for the ASM to have a salary comparable to Mayne-Harrison's the ASM would have to work 70 hours per week every week and receive the highest bonus ($500.00) for a total weekly salary of $604.62 (in 2001, the year that Mayne-Harrison had the lowest salary ($370.00 per week) she received a $13,000 bonus for a total weekly salary of $620.00 per week).  Thus, the undisputed evidence shows that Mayne-Harrison was making more, or at least the same, in her management positions as nonexempt employees. *See **Haines***, 939 F.Supp. at 451; Horne, 775 F.Supp. at 191 ("The difference in pay brings this factor in line with finding that [the plaintiff] is within the executive exemption."); *see also **Grace v. Family Dollar Stores, Inc.***, 2009 WL 2045784 *1, *6 (W.D.N.C. July 9, 2009) (calculating hourly wage based salary and comparing to hourly wage paid to non-exempt employees).

## CONCLUSION

After review of the undisputed material facts and the relevant law, this Court finds that defendant Dolgencorp has shown by a preponderance of the evidence that plaintiff Mayne-Harrison qualifies as an exempt employee under the FLSA. Accordingly, the Court finds that defendant Dolgencorp's Motion for Summary Judgment [Doc. 57] should be, and hereby is, **GRANTED** as defendant is entitled to judgment as a matter of law.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record herein.

**DATED:** September 17, 2010

JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE